### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **BULK LIQUID TRANSPORT, LLC a** | : | |
| **Kentucky limited liability company** | : | **Case No.  1:17-CV-00494** |
| | : | |
| **and** | : | **Judge Susan J. Dlott** |
| | : | |
| **LAWRENCE ECONOMIC** | : | |
| **DEVELOPMENT CORPORATION, an** | : | |
| **Ohio non-profit corporation** | : | |
| | : | **AMENDED COMPLAINT FOR** |
| **Plaintiffs,** | : | **BREACH OF CONTRACT,** |
| | : | **STATUTORY VIOLATIONS, BAD** |
| **v.** | : | **FAITH, NEGLIGENCE,** |
| | : | **COMPENSATORY DAMAGES AND** |
| **SENECA    INSURANCE    COMPANY,** | : | **PUNITIVE DAMAGES** |
| **INC., a New York corporation** | : | |
| | : | **(Jury Demand Endorsed Hereon)** |
| **and** | : | |
| | : | |
| **CUNNINGHAM  LINDSAY  U.S.,  INC.,  a** | : | |
| **Texas corporation,** | : | |
| | : | |
| **Defendants.** | : | |

Plaintiffs, Bulk Liquid Transport, Inc. ("BLT") and the Lawrence Economic Development Corporation ("LEDC"), for their Amended Complaint against Defendants, Seneca Insurance Company ("Seneca") and Cunningham Lindsay U.S., Inc. ("Cunningham Lindsay"), state as follows:

### PARTIES AND JURISDICTION

1.     BLT is a Kentucky limited liability company with its principal place of business at 2151 Upper Johns Creek Road, Kimper, Kentucky 41539.

2.      LEDC is an Ohio non-profit corporation with its principal place of business at 216 Collins Avenue, South Point, Ohio 45680.  LEDC is also the record owner of the property located at 2940 South Third Street, Ironton, Lawrence County, Ohio.

3.      Seneca is a New York corporation licensed to sell insurance in the State of Ohio and sold a policy of insurance to BLT that purported to provide coverage for the property located at 2940 South Third Street, Ironton, Lawrence County, Ohio.

4.      Cunningham Lindsay is a Texas corporation that assists with the evaluation, handling, and settlement of claims, including the insurance claim regarding property located at 2940 South Third Street, Ironton, Lawrence County, Ohio, that is the subject of this lawsuit.

5.      Cunningham Lindsay was acting at all relevant times as an agent and/or representative of Seneca.

6.      Venue is proper in this Court because this action arises from a dispute regarding an insurance policy that was issued in Ohio to cover property located in Lawrence County, Ohio.

**THE SENECA POLICY**

7.      At all relevant times herein, BLT was insured under Seneca Policy Number SSP1504593, which provided coverage for property damage with limits of $1,500,000 for damage to real property and $500,000 for damage to personal property ("the Policy").  A copy of the Policy is attached hereto as Exhibit A.

**FACTUAL BACKGROUND**
**PURCHASE OF PROPERTY AND POLICY**

8.      On or about May 8, 2014, BLT entered into a Real Property Lease ("the Lease") with LEDC for property located at 2940 and 3020 South Third Street in the City of Ironton, Lawrence County, Ohio ("the Property").  *See* Exhibit B.

9.     The Lease included a Grant and Exercise of Option and Purchase Option Agreement ("Purchase Option"), which gave BLT the opportunity to purchase the Property for a total price of $400,000.

10.     The Lease also required BLT to obtain and keep in force an insurance policy covering damage to the Property "in the amount of the full replacement value thereof" with a deductible not to exceed $1,000,000. *Id.*

11.     As required by the Lease, BLT contacted City Insurance Professionals to obtain insurance coverage for property damage.  Although BLT initially requested only $400,000 in coverage, which would have covered the purchase price of the property, BLT was advised that it needed to purchase $1,500,000 in coverage for the real property and an additional $500,000 in personal property coverage.

12.     Seneca issued the Policy to BLT on or about May 24, 2014.  The Policy covered a period from May 24, 2014 to May 24, 2015, and stated that it covered property located at 2940 S. 3rd Street, Ironton, Ohio 45638.  *See* Exhibit A.

13.     The Policy's coverage grant obligated Seneca to pay property damage as follows:

**A.     Coverage**

*We will pay for direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.*

*See* Exhibit A at CP 00 10 (10/12), p. 1 of 16.

14.     The Policy defined Covered Property as follows:

**1.     Covered Property**

*Covered Property, as used in this Coverage Part, means the type of property described in this section, A.1, and limited in A.2.  Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.*

    **a.**    ***Building***, *meaning the building or structure described in the Declarations, including:*

        **(1)**    *Completed additions;*

        **(2)**    *Fixtures, including outdoor fixtures;*

        **(3)**    *Permanently installed:*
            **(a)**    *Machinery; and*
            **(b)**    *Equipment;*

        **(4)**    *Personal property owned by you that is used to maintain or service the building or structure or its premises, including:*
            **(a)**    *Fire-extinguishing equipment;*
            **(b)**    *Outdoor furniture;*
            **(c)**    *Floor coverings; and*
            **(d)**    *Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;*

        **(5)**    *If not covered by other insurance:*
            **(a)**    *Additions under construction, alterations and repairs to the building or structure;*
            **(b)**    *Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building structure.*

    **b.**    ***Your Business Personal Property*** *consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the premises described in the Declarations, whichever distance is greater:*

        **(1)**    *Furniture and fixtures;*

        **(2)**    *Machinery and equipment;*

        **(3)**    *"Stock";*

        **(4)**    *All other personal property owned by you and used in your business;*

        **(5)**    *Labor, materials or services furnished or arranged by you on personal property of others;*

**(6)** *Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:*

**(a)** *Made a part of the building or structure you occupy but do not own; and*

**(b)** *You acquired or made at your expense but cannot legally remove;*

**(7)** *Leased personal property for which you have a contractual responsibility to insure, unless provided for under Personal Property of Others.*

**c.** ***Personal Property Of Others*** *that is:*

**(1)** *In your care, custody and control; and*

**(2)** *Located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater.*

*However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.*

*See* Exhibit A at CP 00 10 (10/12), p. 1-2 of 16.

15. The Policy's Covered Causes of Loss were defined by the Declarations. *See* Exhibit A at CP 00 10 (10/12) at p. 3 of 16.

16. The Policy's Declarations listed "Special" as the Covered Cause of Loss for both the building coverage and the personal property coverage. *See* Exhibit A at SSP 039 (05/97).

17. The Policy included the "Causes of Loss – Special" form, which defined Covered Causes of Loss as "direct physical loss unless the loss is excluded or limited in this policy." *See* Exhibit A at CP 10 30 (10/12) at p. 1 of 10.

18.     The Policy's Declarations listed LEDC as the Mortgagee for the property located at 2940 South Third Street, Ironton, Lawrence County, Ohio, that is the subject of this lawsuit. *See* Exhibit A at SSP 036 (05/97).

19.     The Property had previously been used as a sawmill and lumberyard.  BLT intended to use the property as a garage to store and repair its fleet of vehicles.  BLT expended approximately $225,000 to clean the facility, make necessary repairs, and repurpose the Property as a garage.

20.     BLT exercised its purchase option at the time it signed the Lease.  Its decision to purchase the property required BLT to pay a total of $65,000 to LEDC as a down payment.  BLT was also required to make monthly payments in the amount of $5,000 to LEDC.

## THE PROPERTY DAMAGE OCCURRENCE

21.      On April 8, 2015, an unexpected series of severe thunderstorms swept through Lawrence County, Ohio and the surrounding areas in Kentucky and Ohio.  These storms produced tornadoes, at least one of which hit the Property.  The storms also caused significant damage to the surrounding area.

22.     The tornado caused the entire roof of the Property to lift, which loosened the screws holding the roof down.  This damage allowed water to infiltrate the Property.

23.     The tornado also scattered business personal property, including supplies used in BLT's business and parts used by its drivers to repair their vehicles.  It also damaged several outbuildings used to store these supplies and parts.

24.     Lightning struck the Property, which caused a power surge of 440 volts throughout the Property.  This power surge destroyed any low voltage or 200 volt machinery or

electrical equipment that was plugged in or otherwise connected to the electrical system at the time of the lightning strike.

25.     BLT reported the loss to Seneca on April 8, 2015, the same day the storm and preliminary damage occurred.

26.     On April 9, 2015, BLT's President, Dan Kessler ("Kessler") assessed the damage with Mike Burdette ("Burdette"), another employee of BLT.  Kessler and Burdette observed significant damage to the outbuildings and also noted damage to the adjacent property caused by flying debris from one of the outbuildings.  Kessler contacted Seneca again on April 9, 2015 to notify it of the damage and need for immediate debris removal at the adjacent property.

27.     No representative of Seneca visited the property to assess the damage despite Kessler's two contacts with Seneca.

28.     On April 20, 2015, another round of storms and high winds caused additional damage to the property.

29.     On April 21, 2015, Melanie Conley ("Conley"), an independent adjuster with Cunningham Lindsay, who was retained by Seneca, emailed Kessler to advise that the claim had been assigned to her for handling and to set up a meeting to inspect the property.  *See* Exhibit C.

30.     On April 22, 2015, Conley emailed Kessler to confirm an April 27, 2015 meeting at the property.  Conley also requested a copy of any building lease and information regarding potential additional insurance coverage.  *See* Exhibit D.

31.     On April 27, 2015, approximately three weeks after Kessler reported the initial claim, and before any representative of Seneca had visited the Property, another line of heavy rain and severe storms caused more damage to the Property.  On April 28, 2015, after Seneca

failed to act, Diversified Services, another company owned by Kessler, provided equipment, manpower, and supervision to begin to remove roof debris from the adjacent property.

32.     On April 30, 2015, more than three weeks after the initial storm damage occurred, Conley finally visited the property.

33.     Conley was aware that the Property's main building consisted of two parts: one portion of the building was covered with a metal roof and the other portion was covered with a PVC flat roof. Conley climbed onto the roof and noted that the metal roof panels had been lifted by the tornado and required replacement. She also noted that the PVC roof had sustained extensive damage and required replacement. Conley advised that an engineer retained by Seneca would need to inspect the roof to confirm the need for replacement.

34.     Conley also told Kessler that his claim was not a priority and that Seneca was more concerned with a number of residential property damage claims that had been filed in Kentucky and the surrounding areas after the severe storms occurred.

35.     On May 6, 2015, nearly one month after the initial storm occurred and the claim was submitted to Seneca, Seneca finally acknowledged the claim and the assignment to Conley. *See* Exhibit E.

36.     On May 27, 2015, Seneca advised that that claim had been reassigned from Conley to Robert Smith ("Smith") at Cunningham Lindsay. *See* Exhibit F.

37.     In May 2015, Seneca sent Kate Dicks ("Dicks"), a structural engineer, to inspect the Property. Dicks prepared a report dated June 1, 2015 that included the following findings:

- Kessler had repaired the roof and replaced all interior drywall subsequent to his purchase of the building and prior to the April 8, 2015 storm;

- Those pre-incident roof repairs had stopped any leaks prior to the storm;

- Subsequent to the date of loss, numerous leaks continued throughout the building during every rainfall event;

- The PVC roof experienced movement during the storm, and subsequent water infiltration necessitated replacement of the roof and the gypsum underneath;

- The metal roof also experienced movement during the storm, which necessitated re-coating of the roof with a waterproofing material and removal of affected insulation and drywall.

*See* Exhibit G.

38.     This report was provided to Seneca on or about June 1, 2015.  Despite repeated requests from Kessler and from undersigned counsel, Seneca did not provide a copy of this report to counsel until February 17, 2017, more than eighteen months after the report was completed.

39.     Smith emailed Kessler on June 15, 2015 to advise that Conley had resigned from Cunningham Lindsay.  Smith noted that the file included a large packet of documents to review and indicated that he had received the engineer's report, which was not provided by Cunningham Lindsay or Seneca to BLT or its counsel until January 31, 2017, nearly 18 months after Smith acknowledged that the report was in his possession.  Smith requested a reinspection of the property.  *See* Exhibit H.

40.     Kessler and Smith met at the property on June 19, 2015 for a reinspection.  On June 22, 2015, Smith emailed Kessler and requested statements from Elkins & Sons and Halstead, two contractors who worked on the Property prior to the storm and initial damage, regarding repairs made to the building by Kessler prior to the April 8, 2015 incident.  Smith also requested a report regarding certain personal property and an estimate from a roofer Kessler had asked to inspect the building.  *See* Exhibit I.

41.     On June 24, 2015, Kessler's wife, Elizabeth Kessler, emailed Smith and indicated that she was unable to contact Elkins & Sons.  Elizabeth Kessler also noted that the Halstead invoices had already been given to Conley.  She also expressed frustration with the continued delays in claim handling and noted the effect on Kessler's business.  *See* Exhibit J.

42.     Smith responded on July 1, 2015 and indicated that he was obtaining roofing estimates for both portions of the building.  *See* Exhibit K.

43.     With the delay in repairs and remediation to the building, on August 3, 2015, Kessler was forced to disconnect power to the site due to concerns regarding the power surge and exposure of employees and equipment to electrical shock.

44.     Smith and Kessler spoke by telephone on September 18, 2015.  Smith followed this call with an email on September 20, 2015 to confirm that Seneca had retained an electrical engineer, Rich Wunderly ("Wunderly"), to inspect the property.  *See* Exhibit L.  Smith copied Patrick Spagnuolo ("Spagnuolo"), a Property Claims Examiner with Seneca, on his September 20, 2015 email and requested an update on a $77,037.77 check that Seneca had agreed to issue to BLT as partial payment for this claim.

45.     This $77,037.77 payment represented what Seneca characterized as the "undisputed" portion of this claim.  The payment was inadequate, even by Seneca's own engineer's report, in that the payment contemplated repairs to both the PVC and the metal roof, when the Dicks report recommended replacement of the PVC roof and the gypsum underneath.  The payment also contemplated certain repairs to the building's interior, including drywall repair, which could not be completed for the amount of the partial payment.

46.     Moreover, the payment did not include the cost of necessary repairs to the electrical systems or any of the business personal property.  Thus, even with this partial payment,

BLT remained unable even to remedy the damage to the roof and could not prevent the worsening of the water and moisture damage to the building and its various electrical systems.

47.     On or about September 22, 2015, Wunderly completed his inspection of the property.  Wunderly completed a report dated September 23, 2015, which identified an "overvoltage condition" that damaged the entire 120 volt system, including receptacles, switches, and lights, which required replacement.  *See* Exhibit M.

48.     Wunderly also indicated that the 240 volt service was damaged during the storm and required replacement.

49.     Wunderly's September 23, 2015 report was not provided by Seneca or Cunningham Lindsay to BLT or its counsel despite repeated requests until January 31, 2017.

50.     Thus, as of September 23, 2015, based upon the Dicks report and the Wunderly report, it was undisputed that the building's roof required replacement, that the electrical systems required replacement, and that all electrical equipment, including the HVAC system, required replacement.  However, Seneca has not even made any offers of additional partial payment since its $77,037.77 payment.

51.     On or about September 24, 2015, Smith emailed Kessler and indicated that the damage to the outbuildings was not covered, despite Kessler's purchase of an insurance policy that covered the entire property.  *See* Exhibit N.  To date, Seneca has never provided any factual or legal support or any policy provisions to support its position that the outbuildings were not covered under the Policy.

52.     On October 12, 2015, Spagnuolo wrote to BLT regarding Seneca's purportedly ongoing investigation.  Seneca had inspected this property multiple times and was in possession of its own engineers' reports that recommended extensive repairs and/or replacement of the

Property.  However, despite already having such information and documentation, Spagnuolo advised that BLT was required to demonstrate loss and damage and requested additional supporting documentation of the loss.  *See* Exhibit O.

53.     On October 29, 2015, Smith emailed Kessler and advised that Seneca had retained LCN Electrical Contracting ("LCN") to conduct yet another inspection of the facility.  Smith asked Kessler to call LCN and to arrange the inspection.  *See* Exhibit P.  Thereafter, when it became apparent that Seneca was not going to fulfill its contractual obligations, BLT retained counsel and asked Seneca to work through counsel to arrange the inspection.

54.     On November 12, 2015, Smith emailed BLT's counsel and provided a building repair estimate that did not address any electrical repairs, the loss of BLT's business personal property or certain other property damage.  Smith requested coordination of the LCN inspection and asked Kessler to provide additional documentation of the damage to tools, diagnostic equipment, security system components, telephone system, computers and hardware, and an air compressor.  *See* Exhibit Q.

55.     LCN's inspection finally took place on or about December 7, 2015.  During this inspection, Smith acknowledged that he had received photographs from another electrician but denied that he received a report.  LCN's contractor noted that he would need additional contractors to complete estimates for the safety systems and HVAC.  *See* Exhibit R.

56.     At Seneca's request, BLT submitted a Sworn Statement of Proof of Loss for the commercial property claim to Spagnuolo on March 15, 2015.  *See* Exhibit S.  A second Sworn Statement of Proof of Loss was submitted to Spagnuolo on April 7, 2016.  *See* Exhibit T.

57.     On April 15, 2016, one year after the April 15, 2015 storm and initial damage, Rodney Patterson ("Patterson"), yet another Seneca claims adjuster, wrote on behalf of Seneca

and rejected both Proofs of Loss "because of the number of items claimed." *See* Exhibit U. The same day, Gregory Crapanzano, Seneca's Vice President of Property Claims, emailed Kessler and his counsel to advise of rejection of proofs of loss and assignment of the claim to Patterson, who was now at least the third Seneca employee to handle some aspect of this claim. *See* Exhibit V.

58.     On May 10, 2016, Patterson sent another letter requesting the following additional documentation or clarification:

- Whether the two estimates provided by BLT with its Proof of Loss were for two separate areas of the roof or if they were for the entire roof using different materials. Seneca was already in possession of this information, because Kessler had visited the property with Conley, Smith, and Dicks, and Seneca had received the Dicks report nearly eleven months prior. Patterson also claimed the Dicks report recommended repair, rather than replacement of the roof.

- The nature of the damage to the HVAC unit, despite Wunderly's report indicating that the electrical system had been compromised;

- The discrepancy between BLT's electrician's estimate and Seneca's estimate, even though the Wunderly report addressed the compromise of the electrical system and recommended replacement of the 240 volt and 120 volt systems, along with any electrical equipment that was connected at the time of the storm; and

- An explanation of the damage to a number of pieces of equipment and wiring systems which, again, were addressed in the Wunderly report.

*See* Exhibit W.

59.     Patterson also advised that any mold in the building was not covered under the Policy, even though any mold present in the building was the direct result of Seneca's delay to make a reasonable payment on this claim.

60.     After Seneca's counsel received the Patterson letter, a conflict of interest arose between BLT and LECD, which was also represented by BLT's counsel. This conflict was

eventually resolved, and counsel sent a detailed response letter with multiple supporting documents to Patterson on December 13, 2016.  *See* Exhibit X.

61.     Patterson did not respond to counsel's December 13, 2016 letter until January 13, 2017, when he indicated that Seneca was still evaluating the information provided in and with the December 13 letter.  *See* Exhibit Y.

62.     When counsel still did not receive a response, another email was sent to Patterson on January 31, 2017 requesting a meaningful response by February 10, 2017.  *See* Exhibit Z.

63.     Patterson responded on January 31, 2017, shortly after BLT's counsel again requested a response and more than 20 months after the April 15, 2015 storm and initial damage, and indicated that Seneca was still investigating the claim and would pay any undisputed amount upon calculation by its independent adjuster.  *See* Exhibit AA.  Patterson also finally provided the Wunderly report to BLT's counsel and claimed that they had never been requested prior to December 13, 2016, which was simply not true.  Thereafter, the Dicks report was provided in a second email on February 17, 2017.  *See* Exhibit BB.

64.     Around the same time, and for the first time in the nearly two years the claim had been pending, Seneca requested the Examination Under Oath of Kessler, which took place in Bunnell, Florida on March 8, 2017.  Kessler also made the damaged personal property available for inspection by Seneca's counsel and representative.

65.     On March 24, 2017, nearly two years after the April 15, 2015 incident and damage, Seneca's counsel advised that it was in the process of evaluating the costs for portions of the claim it believed to be undisputed and that payment was likely within a week to 10 days. *See* Exhibit CC.  To date, more than two months later no additional payment has been offered or received.

66. During a meeting with Seneca's counsel on March 28, 2017, BLT's counsel advised that the building was contaminated with toxic mold and that, due to the delay in claim handling and payment, was no longer salvageable. On March 30, 2017, BLT's counsel provided a demolition estimate for the building. *See* Exhibit DD.

67. Rather than paying the undisputed portion of the claim, Seneca demanded another property inspection by an environmental hazard expert and two additional structural engineers. Following this inspection, which occurred on April 28, 2017 and lasted more than 6 hours, Seneca advised that, despite a report from BLT's expert that indicated the building was filled with toxic mold, it had not completed any testing because it did not believe it was necessary.

68. Since this last inspection on April 28, no progress has been made towards resolution of this claim. Seneca remains unwilling to make any payment toward the personal property claim or the building claim, even though it has ample opportunity to inspect the damaged property and gain an understanding of the scope of the damage.

69. Despite Seneca's multiple and continuing promises and representations that it has nearly completed its evaluation and intends to pay this claim, Seneca continues, more than two years after the April 2015 storm and resulting damage, to search for excuses not to pay BLT under the Policy. Seneca continues to delay and refuses to provide any meaningful response or to make any effort to pay all or any portion of this claim.

70. Seneca and/or Cunningham Lindsay have completed at least six inspections of the property and obtained at least four reports and/or estimates detailing the damage to the building, not counting the estimates obtained by BLT and provided to Seneca and/or Cunningham Lindsay. Seneca has had more than adequate time and information to fully and fairly investigate, evaluate, and settle this claim if it had intended to do so.

71.     Seneca and Cunningham Lindsay have unreasonably delayed in investigating, evaluating, and paying this claim.  This delay has resulted in significant additional damage to the building.  BLT has suffered total damages in excess of $2,000,000.  *See* Exhibit EE.

72.     The building has continued to sustain more water damage during every rain event since the initial damage occurred on more than two years ago on April 8, 2015.

73.     The Property is uninsurable in its current condition, which exposes BLT, Kessler, and LEDC to personal liability.

74.     In addition to the amounts shown on Exhibit DD, BLT has suffered loss of business income, as the damage to the building and Seneca's failure to timely process, adjust, and pay this claim have prevented BLT from getting its business back up and running.  Due to the nature of its business, BLT cannot relocate to a different facility because there are no suitable alternative locations in the area.

75.     BLT has also forfeited the $65,000 deposit it paid to LEDC due to its inability to perform under the purchase option agreement.

76.     BLT has also incurred expenses since the date of the initial damage to store the damaged personal property so that it could be preserved and available for inspection by Seneca and/or Cunningham Lindsay.  BLT's counsel inquired on May 24, 2017 as to whether BLT could dispose of the damaged personal property because Seneca and/or Cunningham Lindsay have had more than two years to inspect the property if they wished to do so.  Seneca's counsel responded more than a week later and advised that Crapanzano, the fifth representative from Seneca and/or Cunningham Lindsay to handle this claim, was on "personal leave" for an unspecified period of time.  *See* Exhibit FF.

77.     BLT's damages continue to increase daily due to Seneca's failure to timely complete its evaluation, failure to timely respond to communication, and failure to timely pay portions of this claim that are undisputed so that repairs could be made to the Property and so that BLT can dispose of the unsalvageable personal property.

78.     Because BLT has been unable to restart its business, it has been unable to complete its purchase of the Property from LEDC.  As a result, LEDC remains the record owner of the Property and has been forced to pay property taxes on the building.

79.     LEDC has also suffered setbacks in its attempts to revitalize the Lawrence County, Ohio economy.  LEDC agreed to sell the Property to BLT for a below-market price because BLT's business would create badly needed jobs in Lawrence County.  LEDC is unable to resell the Property to another buyer due to the building's continually deteriorating condition, which directly arises from Seneca and Cunningham Lindsay's wrongful delays in investigating, evaluating, and paying this claim.

80.     BLT's inability to conduct business has resulted not only in the loss of jobs by BLT's employees, but has also adversely affected the business of a number of owner-operated trucking companies that used BLT's facility.  The Lawrence County community has lost the benefit of these jobs for the last two years and will continue to lose this benefit as long as Seneca and Cunningham Lindsay's wrongful conduct persists.

81.     Seneca has breached the insurance contract in its unacceptable handling and refusal to pay this claim.

82.     Seneca and Cunningham Lindsay have caused unreasonable delays in the handling of this claim by repeatedly requested information, all or most of which was already in their possession.

83.    Seneca rejected BLT's proofs of loss because of the "number of items claimed" in the proof of loss.  There is nothing in the Policy or in insurance law that limits the number of items claimed in relation to a loss or claim, and there is nothing in the Policy or in insurance law that provides a basis for denying a claim simply based upon the number of items listed on a proof of loss form.

84.    Seneca has, in multiple ways and multiple instances, violated Ohio insurance regulations and statutes governing the handling of insurance claims.

85.    Seneca has shown a total disregard for the rights and personal and business interests of its insureds and acted maliciously and in bad faith towards BLT and LEDC.

86.    Due to Seneca's wrongful and intentional conduct, BLT and LEDC are entitled to punitive damages.

## COUNT I
## BREACH OF CONTRACT

87.    BLT timely provided Seneca with notice of this claim.

88.    BLT submitted to multiple site inspections by Seneca and Cunningham Lindsay, complied with repeated requests for documents and information already provided to Seneca and Cunningham Lindsay, and otherwise fully complied with all conditions precedent to coverage.

89.    Seneca has failed to make a reasonable and timely investigation into this claim.

90.    Seneca has failed to properly staff the handling of this claim to avoid duplicative requests for information and timely processing of documents and information.

91.    Seneca has refused to make payment to BLT and/or its mortgagee, LEDC, of the undisputed portions of this claim without reasonable justification.

92.    Seneca has failed to comply with the terms and conditions of the Policy and has breached its contract in the delay and investigation and payment of the claim.

93.     As a direct and proximate result of Seneca's breach of the insurance contract, BLT and LEDC have been damaged in excess of this Court's jurisdictional minimum.

**COUNT II**
**UNFAIR AND/OR DECEPTIVE TRADE PRACTICES**

94.     Seneca and Cunningham Lindsay have engaged in the unfair trade practices identified in OH ADC 3901-1-07 as set forth below.

95.     Seneca and Cunningham Lindsay knowingly misrepresented pertinent facts to BLT by withholding reports that were unfavorable to Seneca's position on this claim.

96.     Seneca failed to acknowledge pertinent communications within fifteen days of receiving this claim.

97.     Seneca and Cunningham Lindsay failed to adopt and implement reasonable procedures to commence its investigation of this claim within twenty-one days of receipt of notice of said claim.

98.     Seneca and Cunningham Lindsay failed to mail or furnish BLT and/or BLT's authorized representative a notification of all items, statements, and forms that Seneca required of BLT within fifteen days of receiving notice of this claim.

99.     Seneca and Cunningham Lindsay failed to make an offer to pay this claim for a fair and reasonable amount.

100.    Seneca and Cunningham Lindsay's refusal to investigate and pay this claim has compelled BLT to file suit against it.

101.    Seneca failed to advise BLT every ninety days as to the reasons additional time is needed for investigation.

102.    Seneca and Cunningham Lindsay have further violated OH ADC 3901-1-54 as set forth below.

103. Seneca failed to acknowledge receipt of this claim within fifteen days.

104. Seneca failed to respond to communications from BLT and/or its counsel within fifteen days.

105. Seneca failed to tender payment to BLT and/or LEDC for the undisputed portion of this claim within ten days of acceptance of the claim.

106. Seneca and Cunningham Lindsay compelled BLT and LEDC to file suit against it to recover payments due under the Policy.

107. As a direct and proximate result of Seneca and Cunningham Lindsay's violation of the above-cited regulations, BLT and LEDC have been damaged in excess of this Court's jurisdictional minimum.

<u>**COUNT III**</u>
<u>**BAD FAITH**</u>

108. Seneca has a duty to act in good faith towards its insured, BLT, and BLT's mortgagee, LEDC.

109. Seneca lacks reasonable justification for the delay in investigating and paying BLT's claim.

110. Seneca failed to investigate, handle, and pay this claim in a timely manner.

111. Seneca continues to refuse to pay BLT and/or LEDC the undisputed portion of this claim.

112. Seneca has breached its fiduciary duty to BLT and LEDC and has otherwise acted in bad faith.

113. As a direct and proximate result of Seneca's bad faith, BLT and LEDC have been damaged in excess of this Court's jurisdictional minimum.

## COUNT IV
## NEGLIGENCE

114.    Seneca hired and/or retained Cunningham Lindsay to investigate and/or handle this claim for the benefit of BLT and/or LEDC.

115.    Because BLT was a beneficiary of the agreement between Cunningham Lindsay and Seneca, Cunningham Lindsay owed a duty to BLT to promptly and fully investigate and/or handle claims in a timely matter.

116.    Cunningham Lindsay breached its duty to BLT and LEDC by unjustifiably and unreasonably delaying the investigation, handling, and/or payment of this claim.

117.    As a direct and proximate result of Cunningham Lindsay's negligence, BLT and LEDC have been damaged in excess of this Court's jurisdictional minimum.

## COUNT V
## PUNITIVE DAMAGES

118.    BLT and LEDC are entitled to punitive damages due to Seneca and Cunningham Lindsay's unreasonable delay, lack of good faith claims handling, failure to timely investigate, ill will, and conscious disregard for the rights of BLT and LEDC, which Seneca and Cunningham Lindsay knew or should have known had a great probability of causing substantial harm to BLT and LEDC.

119.    Seneca and Cunningham Lindsay's business practices consistently demonstrate a lack of good faith and a pattern of unfair and/or deceptive practices toward its insureds, including BLT and its mortgagee, LEDC.

**WHEREFORE**, BLT and LEDC demand judgment against Seneca and Cunningham Lindsay in excess of this Court's jurisdictional minimum.  BLT and LEDC further demand

punitive damages, costs, interest, attorney's fees, extracontractual damages, and any other relief this Court deems just and proper.

Respectfully submitted,

/s/ Aaron M. Herzig
Aaron M. Herzig (0079371)
Donnell J. Bell (0091265)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Phone: (513) 381-2838
Fax: (513) 381-0205
aherzig@taftlaw.com
dbell@taftlaw.com

*Counsel for Plaintiffs Bulk Liquid Transport, LLC and Lawrence Economic Development Corporation*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was filed electronically on August 21, 2017. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Aaron M. Herzig*